In re Ronald L. GERTSCH, Debtor.

Ronald L. Gertsch, Appellant,

v.

Johnson & Johnson, Finance Corporation, Appellee.

BAP No. CC–98–1288–BKMe.

Bankruptcy No. LA 96–53197–SB.

Adversary No. LA 97–02452–SB.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Jan. 20, 1999.

Decided July 30, 1999.

L. Scott Keehn, Robbins & Keehn, San Diego, CA, for Ronald L. Gertsch.

Joshua D. Wayser, Stern, Neubauer, Greenwald & Pauly, Santa Monica, CA, for Johnson & Johnson Finance Corporation.

Before BRANDT, MEYERS, and KLEIN, Bankruptcy Judges.

## OPINION

BRANDT, Bankruptcy Judge.

### OVERVIEW

The bankruptcy court granted summary judgment, finding plaintiff's state court judgment nondischargeable under § 523(a)(2)(B) of the Bankruptcy Code [1]. We AFFIRM, but vacate the judgment in

---

1. Absent contrary indication, all chapter and section references are to the Bankruptcy Code, 11 U.S.C., and all "Rule" references are to the Federal Rules of Bankruptcy Procedure. "FRCP" references are to the Federal Rules of Civil Procedure.

part and remand for clarification that the bankruptcy court's judgment is not an independent money judgment, but merely a determination that the state court's judgment is excepted from discharge.

## I. FACTS

Debtor/appellant Ronald Gertsch ("Gertsch") is a general surgeon licensed to practice medicine in California. He operated his own practice from 1979 through at least 1995, initially as "Ronald Gertsch, M.D., Inc.," and eventually forming four other medical corporations, including Outpatient Care Group ("OCG"), set up in the mid–1980's to run an outpatient surgery center. Gertsch was responsible for the day-to-day administration of the center, including review of accounting issues. In the course of forming and operating his businesses, he sought financing from various sources, and had entered into equipment leasing transactions.

In January 1993, OCG, which had filed a Chapter 11 petition in the Southern District of California in 1992, failed recertification by the California Department of Health Services, resulting in the shutdown of OCG and appellant's other entities until 28 June 1993. The shutdown caused Gertsch a serious cash flow problem; he engaged the services of Portfolio Capital Partners ("Portfolio"), a loan broker with whom he had prior dealings, to help him obtain $2 million in working capital. In early April 1993, Portfolio submitted a loan proposal to Johnson & Johnson Finance Corporation ("JJFC"), which included a personal financial statement he completed 19 March 1993, and various documentation. None of the documents submitted to JJFC indicated that debtor's medical practices had been shut down, nor did Gertsch otherwise disclose that fact to JJFC.

The personal financial statement reflected a net worth of $1,088,000, and indicated a contingent liability of $150,000 for federal income taxes as his only liability. He projected $650,000 as his salary for 1993. Omitted were the rent arrearages for the business premises, on which Gertsch was personally liable, a $400,000 loan from OCG, an obligation owed to another doctor, and the obligation he owed on OCG.

In April or May, after filling out his financial statement, Gertsch borrowed approximately $100,000 from the parents of Caroline Baddour, his then-girlfriend. He was also served with two unlawful detainer complaints, filed by the landlords of his surgery centers. None of these events was disclosed to JJFC.

JJFC turned down Gertsch's request for a $2 million loan. He then sought a reduced loan of $900,000, based on the same application documents, which was approved. On 6 May he executed a Loan and Security Agreement, a Promissory Note, and security documents in favor of JJFC, and the loan was funded on 7 May 1993.

Gertsch made the first four monthly payments and partially paid the fifth installment. In February of 1994, the parties renegotiated the loan, and he signed an addendum to the original loan and security agreement, explicitly an amendment to the 1993 agreement, and a new promissory note. In October 1994, Gertsch again fell behind in payments, and the parties again renegotiated. He executed another promissory note and another addendum to the 1993 agreement, refinancing the past due amounts and late fees. After further default, JJFC filed a complaint against Gertsch for breach of contract in San Diego County Superior Court, obtaining a default judgment for $1,157,574.96 on 24 May 1996.

Gertsch then filed his voluntary Chapter 7 petition, and JJFC filed this adversary proceeding, seeking to have its state court judgment declared nondischargeable under §§ 523(a)(2)(A) and (a)(2)(B), and praying the court find Gertsch liable to JJFC "for damages in a sum according to proof[.]" JJFC moved for summary judgment based

on the facts admitted in the joint pre-trial order.

Among the evidence on summary judgment was Gertsch's declaration, filed 6 January 1993 in connection with a motion to continue the employment of OCG's counsel in its separate bankruptcy case. In the declaration, Gertsch stated that his monthly living expenses far exceeded his income; that he did not own any real property or have any equitable or contingent interest in real property; and that he was unable to repay a shareholder loan from OCG, given his lack of assets and current personal financial situation.

At hearing on JJFC's motion on 7 April 1998, the bankruptcy court granted summary judgment in favor of JJFC for $1,373,867.02, declaring that sum nondischargeable under § 523(a)(2)(B). Contemporaneously with the judgment, the court entered written findings and conclusions tendered by counsel for the prevailing party. As submitted, conclusion 11 stated that JJFC had reasonably relied on the financial statement. The judge crossed out "reasonably" and wrote in "justifiably." JJFC filed an ex parte application under Rule 9024 and FRCP 60(a) to have the findings and conclusions amended to change "justifiably" back to "reasonably," the reliance required for nondischargeability under § 523(a)(2)(B). A copy of the application was delivered to Gertsch's counsel. The judge entered an order granting JJFC's request, and later entered the amended findings. This appeal followed.

## II. ISSUES

A. Whether Gertsch waived arguments not listed in his Rule 8006 statement of issues;

B. Whether the bankruptcy court had jurisdiction to amend its findings and conclusions under Rule 9024 after the notice of appeal had been filed;

C. Whether summary judgment that the debtor made misrepresentations with the intent to deceive, and that JJFC reasonably relied on debtor's personal financial statement, was proper; and

D. Whether the bankruptcy court erred in including a money judgment in the nondischargeability judgment.

## III. STANDARDS OF REVIEW

■ We review summary judgments de novo; facts determined for summary judgment proceedings are not entitled to the clearly erroneous standard of appellate review. *In re Audre, Inc.*, 216 B.R. 19, 25 (9th Cir. BAP 1997). If the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, summary judgment will be upheld. FRCP 56(c), incorporated by Rule 7056; *see Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 272 (9th Cir. BAP 1990).

■ Where intent is at issue, summary judgment is seldom granted, *see Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996), *cert. denied*, 522 U.S. 808, 118 S.Ct. 48, 139 L.Ed.2d 14 (1997); however, "summary judgment is appropriate if all reasonable inferences defeat the claims of one side, even when intent is at issue." *Newman v. Checkrite California Inc.*, 912 F.Supp. 1354, 1380 (E.D.Cal.1995) (citing *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir.1990)). *See also Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.") *See also*, 10B Charles Alan Wright, et. al., *Federal Practice & Procedure: Civil 3d* § 2730 (1998).

## IV. DISCUSSION

A. *Arguments not raised in statement of issues on appeal*

■ Gertsch's Rule 8006 statement lists two issues, and purports to reserve a right

to present additional issues in his opening brief. That brief includes several issues not in the statement of issues.

JJFC, citing our decision in *In re Pine Mountain, Ltd.,* 80 B.R. 171, 173 (9th Cir. BAP 1989), argues that Gertsch waived the additional issues. Although *Pine Mountain* and our decision in *In re National Lumber & Supply, Inc.,* 184 B.R. 74 (9th Cir. BAP 1995), support this waiver argument, recent Ninth Circuit authority casts doubt upon that proposition.

The Ninth Circuit has held that the U.S. Trustee did not waive arguments not specifically listed in the Rule 8006 statement of issues, because that rule does not limit a party's appeal from a bankruptcy court's judgment: "Rule 8006 exists to ensure the adequacy of the record, and does not affect the ability of any party to appeal findings or conclusions of the bankruptcy court." *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.,* 104 F.3d 1147, 1148 (9th Cir.1997), *citing* 9 Collier on Bankruptcy § 8006.04 (15th ed.1996).

The rationale for the holding in *Bishop* is that the Rule 8006 statement of issues relating to the first layer of bankruptcy appeal "does not impact upon issue statements required by the court of appeals [at the second layer of bankruptcy appeal under the Federal Rules of Appellate Procedure]. The two are separate in nature and distinct in result." *Id.*

Regardless of whether *Bishop* squarely applies to appeals before this Panel, we have been willing to entertain arguments not specified in the Rule 8006 statement of issues when a complete understanding of the case can be discerned from the briefs and the record. *In re Turner,* 186 B.R. 108, 113 (9th Cir. BAP 1995). In the end, it is a matter of common sense: it would be an odd doctrine that prevented us from considering an issue that could nevertheless be raised in the court of appeals on appeal from our disposition.

We adhere to those positions, noting that JJFC has not asserted any prejudice from appellant's failure "to confine the arguments in his brief to the issues specified in the statement of issues." Had JJFC been blindsided, and not designated something for the record relating to an unstated issue, we would not hear appellant on that issue, notwithstanding the purported reservation of a right to raise issues later.

## B. *Amending findings*

■ Gertsch argues that the bankruptcy court lacked jurisdiction to amend its findings and conclusions after the notice of appeal had been filed. In addition, he argues that correction was beyond the scope of FRCP 60(a), because it was substantive in nature.

This argument misses the mark, because we review summary judgments de novo: debates about the trial court's subsequent adjustments in its reasoning are irrelevant. We engage in the same inquiry into the same record as the trial court, considering evidence meeting the requirements of FRCP 56(e), applicable via Rule 7056, applying the standards set forth above, and determining whether the party resisting summary judgment has shown the existence of a genuine issue of material fact warranting trial. *In re Younie,* 211 B.R. 367, 372 (9th Cir. BAP 1988), *aff'd,* 163 F.3d 609, 1998 WL 668120 (9th Cir.1998).

Gertsch mistakes summary judgment findings for findings of fact and conclusions of law under FRCP 52, applicable via Rule 7052. When a trial court designates its explanation of its summary judgment ruling as findings of fact and conclusions of law, it is not making formal findings and conclusions within the meaning of FRCP 52. Hence, it is not constrained by the rules applicable to amending such findings. Moreover, the trial court did not change its result—only its reasoning.

■ We consider only whether summary judgment was proper, and not the precise reasoning of the trial court. While the trial court's explanation of its decision assists us in evaluating the summary judg-

ment evidence, de novo review means that we need not follow the same reasoning.

## C. *Nondischargeability*

Turning to the substantive merits of this appeal, § 523(a)(2)(B) provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt— ...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— ...

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

§ 523(a)(2)(B) (West 1998).

▮ The Ninth Circuit has reworded these statutory elements. Nondischargeability under this section requires:

(1) a representation of fact by the debtor,

(2) that was material,

(3) that the debtor knew at the time to be false,

(4) that the debtor made with the intention of deceiving the creditor,

(5) upon which the creditor relied,

(6) that the creditor's reliance was reasonable, and

(7) that damage proximately resulted from the representation.

*In re Candland*, 90 F.3d 1466, 1469 (9th Cir.1996). These elements must be proven by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Here, elements 1 and 7 are not in dispute. While appellant's statement of issues in its opening brief includes the question of whether "defendant made *material* omissions or misrepresentations with the *intent to deceive* " (emphasis in original), nowhere in the brief does he argue the misrepresentations were not material, nor was this argument made below. Accordingly, we will not consider the materiality of any factual issue regarding element 2. *In re Medina*, 205 B.R. 216, 220 n. 8 (9th Cir. BAP 1996).

We focus on elements 3–6: knowledge of falsity and intent to deceive together, and reasonable reliance.

### 1. . *Knowledge and intent*

▮ The scienter requirement for a fraudulent misrepresentation is established by showing "either actual knowledge of the falsity of a statement, or reckless disregard for its truth...." *In re Houtman*, 568 F.2d 651, 656 (9th Cir.1978). Although *Houtman* was a case under § 17(a)(2) of the Bankruptcy Act of 1898[2], its statement of the law is here applicable, as the Act's intent elements were essentially identical to elements (3) and (4) of § 523(a)(2)(B), quoted above from *Candland:* "(2) That at the time [debtor made the representations] he knew they were false; (3) That he made them with the intention and purpose of deceiving the creditor...." *Houtman*, 568 F.2d at 655.

Other circuits are in accord, holding that intent to deceive can be inferred from the totality of circumstances, including reck-

---

**2.** Which provided:

"(a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as (2) are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive, or for willful and malicious conversion of the property of another."

*Houtman*, 568 F.2d at 655 (quoting § 17(a)(2) of the Bankruptcy Act).

less disregard for the truth. *National Union Fire Ins. Co., Pa. v. Bonnanzio (In re Bonnanzio),* 91 F.3d 296, 301 (2d Cir. 1996); *Norris v. First Nat'l Bank (In re Norris),* 70 F.3d 27, 30 (5th Cir.1995); *Insurance Co. of N. Am. v. Cohn (In re Cohn),* 54 F.3d 1108, 1119 (3d Cir.1995); *In re Miller,* 39 F.3d 301, 305 (11th Cir. 1994); *Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163, 1167 (6th Cir. 1985). *See also Aubrey,* 111 B.R. at 268, 274 ("Fraudulent intent may be determined by circumstantial evidence.")

■ Further, "It is well established that where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Field v. Mans,* 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Under the Restatement, "the most widely accepted distillation of the common law of torts," *Field,* 516 U.S. at 70, 116 S.Ct. 437,

> [a] misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

*Restatement (Second) of Torts* § 526 (1977). A representation may be fraudulent, without knowledge of its falsity, if the person making it "is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented." *Id.* at § 526, cmt. e (1977).

Against this background, Gertsch contends that there is a genuine issue of material fact regarding his intent: he says he can reconcile his personal financial statement with his earlier declaration, and argues he should be given the opportunity to do so at trial.

■ According to JJFC, the financial statement was false in three respects: first, in overstating debtor's assets; second, in understating his liabilities; and third, in overstating his projected income for 1993.

We consider these assertions in turn:

### a. Assets

JJFC's argument that the assets were overstated is based solely on Gertsch's 6 January 1993 declaration, in which he stated that he lacked sufficient assets to repay his shareholder loan. Gertsch testified in his deposition that the $113,000 cash was money he kept in a safe at home. He further testified that the $835,000 value of the business was based on some offers received in the early 1990's. Finally, the financial statement disclosed that the real property valued at $45,000 was held in the name of the Gertsch Family Trust. The remaining assets are not in dispute.

Viewing this evidence in the light most favorable to Gertsch, we cannot fairly say there are no issues of material fact regarding falsity or his knowledge of falsity. We need not, however, reverse, for, as will be seen, we conclude below that there is no such issue regarding Gertsch's overstatement of his projected income. In the context of multiple alleged misrepresentations, an issue of fact respecting one does not bar summary judgment.

### b. Liabilities

JJFC asserts that Gertsch did not disclose significant liabilities: (a) a personal loan of $100,000 from the parents of Caroline Baddour; (b) rent arrearages for the premises occupied by debtor's businesses for which he was personally liable; (c) obligations owed to other doctors; and (d) the $400,000 loan from OCG.

Gertsch explained that the Baddour loan was obtained in April or May, after the financial statement had been completed. In addition, he argues that the rent arrears and funds owed to the seller of OCG

were loans that he had personally guaranteed, and he did not understand the nature of the contingent liability involved. Finally, Gertsch asserts he did not remember whether he still owed money to the other doctors when he filled out the financial statement. His deposition testimony implies that he thought the obligation had been satisfied by the assignment of certain accounts receivable. While these explanations might not survive cross examination, they raise factual issues that might, in isolation, preclude summary judgment.

In contrast, Gertsch's explanation for the omission of the OCG loan, that he did not understand the nature of the transaction, seems implausible in light of the declaration he had filed in the OCG bankruptcy only two months before completing the financial statement. In that declaration, it was clear he understood he was obligated to repay the shareholder loan to OCG. Moreover, in his deposition Gertsch admitted to having an obligation to OCG: "I guess there was a loan, yeah, to me." However, Gertsch asserted in his declaration opposing summary judgment the omission was unintentional. While this arguably raises a material factual controversy, we see no reason to distinguish between a prior declaration and deposition testimony, and "[t]he general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting [her] prior deposition testimony." *In re Rothery*, 211 B.R. 929, 935 (9th Cir. BAP 1997), (citing *Kennedy v. Allied Mut. Ins., Co.*, 952 F.2d 262, 266 (9th Cir.1991), *rev'd* on other grounds, 143 F.3d 546, 1998 WL 220257 (9th Cir.1997)).

Before applying this rule, the court must determine that the contradiction is a "sham." *Id.* In *Rothery*, the bankruptcy judge had examined the contradictions and found them not credible; this was held sufficient under *Kennedy.* 211 B.R. at 935. Here, we have no such finding in the record. The bankruptcy court may have made one—there are references to a tentative ruling, but that ruling is nowhere to be found in the record (an all too common occurrence: frequently, a tentative ruling is incorporated in the final ruling or is essential to understanding it; the excerpts of record on appeal must, but, with distressing regularity, do not, include it, making review impossible). Were this aspect determinative, we would reverse and remand, instructing the bankruptcy judge to consider whether Gertsch's declaration in opposition was a sham.

#### c. *Income*

Gertsch explains his projection of $650,000 in salary for 1993 is based on previous years' incomes, and that, although the clinics were shut down, he was confident the clinic license would be reinstated, as it eventually was. According to Gertsch's income tax returns, his adjusted gross incomes for 1991 and 1992 were $408,548 and $591,410, respectively. JJFC argues that the projected income figure was, in light of the shutdown, fraudulent.

In mid-March, when Gertsch prepared the financial statement, the clinics had been shut down approximately three months, and did not reopen for more than three months. Gertsch had testified that during the shutdown he was "really hurting for cash."

Although characterized as "projected," the 1993 salary Gertsch stated was utterly unrealistic in light of the shutdown. The record discloses no objective basis for his purported confidence that reinstatement was imminent, nor that he could expect to earn salary at an annual rate approximating $875,000 if the clinics were recertified and reopened the next day.

In response to the Motion for Summary Judgment, Gertsch articulated no factual basis for drawing any inference from this evidence other than he provided the $650,000 income figure with intent to deceive, or at least with reckless disregard for the truth. The latter carries the motion: conclusory allegations and improbable inferences are not sufficient. *Medina–Munoz,*

896 F.2d at 8. There was no need for trial.

#### d. *Preliminary Estimate*

Finally, Gertsch argues on appeal for the first time that the inference to be drawn from any inaccuracies in the financial statement should be that they were intended as a "preliminary estimate" of his financial position. He cites to no evidence in the record, and makes no plausible argument why we should consider "preliminary" a financial statement made on a federal agency's form, signed and certified to be true and correct immediately below the legend, "I understand FALSE statements may result in ... possible prosecution by the U.S. Attorney...."

We reject the contention, and note that it suffers from the same flaw as his argument regarding Gertsch's projected income.

#### 2. *Reasonable reliance*

The Ninth Circuit has not been more specific than the statute in defining reasonable reliance under § 523(a)(2)(B), noting that "[r]easonable reliance is a term courts can apply without additional help." *Candland,* 90 F.3d at 1471. The Third Circuit has defined reasonable reliance as "that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances," *Cohn,* 54 F.3d at 1117, and the Seventh that reasonableness depends on the circumstances. *In re Harasymiw,* 895 F.2d 1170, 1173 (7th Cir.1990). *See also Martin,* 761 F.2d at 1166; *In re Figge,* 94 B.R. 654, 665 (Bankr.S.D.Cal. 1988), *aff'd,* 928 F.2d 1136, 1991 WL 37803 (9th Cir.1991) (table).

 "Lenders do not have to hire detectives before relying on borrowers' financial statements.... '[A]lthough a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification.'" *Figge,* 94 B.R. at 666 (quoting *In re Garman,* 643 F.2d 1252, 1260 (7th Cir.1980)).

 In that same vein we have noted that, when there is evidence of materially fraudulent statements, little investigation is required for a creditor to have reasonably relied on the representations. *See In re Gosney,* 205 B.R. 418, 421 (9th Cir. BAP 1996) (citing *Candland,* 90 F.3d 1466, and *In re Lansford,* 822 F.2d 902, 904 (9th Cir.1987)). *See also Bonnanzio,* 91 F.3d at 305 ("Once it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) ... is a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith.")

 Gertsch argues that JJFC did not present evidence it had followed its normal business practices in extending credit to Gertsch; that JJFC presented no evidence of the extent to which its procedures were in accordance with the custom in the industry; and that Gertsch's financial statement, when considered along with the other documents and information in JJFC's possession, revealed discrepancies and raised "red flags" requiring JJFC to investigate further.

Gertsch's first argument is contradicted by the declaration of Anne Furnari, JJFC's Manager of Operations, in which she outlines JJFC's procedures and explains how the Gertsch loan was handled in conformance with those procedures.

 "Industry custom" is merely a guideline, and not an element that must be proven before reliance can be said to be reasonable. As noted in *Cohn,* 54 F.3d at 1117, absent other factors, a creditor demonstrates reasonable reliance by showing that it followed its normal business practices.

As for the "red flag" arguments, to say that the items Gertsch contends should have led JJFC to further investigation

would require us to impose a more stringent investigation requirement than is required by the prevailing law of the Ninth Circuit:

• Gertsch says one "red flag" is that the financial statement indicated Gertsch had no unpaid taxes, while the credit report revealed numerous outstanding tax liabilities and one of the reasons for obtaining the loan was to pay off tax liabilities. However, Gertsch listed a contingent tax liability on his financial statement, and JJFC inquired about that tax liability before approving the loan.

• The second purported "red flag" is that Portfolio represented to JJFC that Gertsch had paid off his home mortgage, but Gertsch did not list his home on the financial statement. It would not have been unreasonable for JJFC to conclude that the reference was to a mortgage on the real estate listed on the financial statement, giving no reason to investigate further.

■ • The third purported "red flag" is that JJFC knew Gertsch was involved with OCG, and thus should have investigated whether Gertsch was personally liable on some of OCG's obligations. While JJFC does not appear to have specifically investigated this matter, there are numerous other indicia of a thorough credit investigation, and "[t]he debtor[ ] cannot simply rely on minor clues of falsity in financial statements that on the whole have the appearance of being very complete and reliable and where [the creditor] took reasonable steps to inquire as to the creditworthiness of the debtor[ ]." *Gosney* 205 B.R. at 421 (citing *In re Siriani,* 967 F.2d 302 (9th Cir.1992)). · Here, JJFC considered not only the financial statement, but also other data supplied by Gertsch and· Portfolio, including a cash flow analysis, pro forma income statement, tax returns, and credit reports. In addition, JJFC requested additional information from the debtor, turned down the initial request for $2,000,000, and later approved

the reduced amount, negating any suggestion that JJFC acted in bad faith.

None of the "red flags" has much color. .JJFC's papers showed reliance and reasonableness; Gertsch submitted no contradictory evidence, merely argument. Summary judgment was proper.

### 3. *Novation*

■ Finally, Gertsch argues that there is no evidence that JJFC relied on the financial statement in negotiating the replacement loans. He argues there is an issue of fact to whether the replacement loans were novations under New Jersey law, applicable by the terms of the original Loan and Security Agreement. Under New Jersey law, a novation requires a "clear and definite intention on the part of all concerned that such is the purpose of the agreement. . . . · The intention by the obligor that the existing debt should be discharged by the new obligation must be concurred in by both debtor and creditor." *The Sixteenth Ward · Building. & Loan Ass'n v. Reliable Loan, Mortgage & Security Co.,* 125 N.J. Eq. 340, 5 A.2d 753, 755 (1939).

■ Nothing in the record suggests the renegotiated notes were novations; to the contrary, they are explicitly refinancings incorporating the original agreement. Novation or not, fraud in the initial application cannot be excused when a loan is renewed, particularly where the creditor is unaware of the initial fraud. *In re Garman,* 643 F.2d 1252, 1260 (7th Cir.1980); *In re Kim,* 125 B.R. 594 (Bankr.C.D.Cal. 1991); *In re Allen,* 65 B.R. 752, 764 (E.D.Va.1986).

### D. *Money judgment*

■ The judgment entered by the bankruptcy court includes the following sentence: "Judgment is entered in favor of JJFC and against Gertsch in the sum of $1,373,867.02." Gertsch argues that the bankruptcy court did not have jurisdiction to enter a money judgment, because JJFC

did not allege a claim for relief for money damages.

JJFC points out that its complaint included a prayer that the court find Gertsch liable to JJFC for damages in a sum according to proof, and that the judgment amount represents the amount of the state court judgment with additional interest calculated to the date of the judgment. Nevertheless, JJFC has not explained why it should have money judgments in both courts, and we see no reason.

 The judgment, prepared by JJFC, should have been more artfully worded to reflect that it was not creating a separate money judgment. The problems are more than merely theoretical. The state court has entered a judgment for $1,157,574.96 according to proof acceptable to it. The bankruptcy court merely accepted that sum and added post-judgment interest through the date of its judgment, entering a judgment for $1,373,867.02. In principle, the judgment debtor could return to the state court for relief from that judgment for reasons permitted by state law, and the state court could reduce the judgment debt. Were such reasons to exist, the separate federal money judgment, not based upon any independent determination, adds nothing but confusion. Moreover, it might give the plaintiff a windfall, by rolling post-judgment interest into the principal of the new federal money judgment, on which post-judgment interest runs, transmuting the state court post-judgment simple interest into compound interest. Where the debt at issue has · been reduced to judgment, the bankruptcy court's judgment in a nondischargeability action should merely declare the prior judgment nondischargeable (or not) in whole or in part.

Reviewing the summary judgment record de novo, we find nothing to support either the entry of a new money judgment, or finding a different amount nondischargeable. We will vacate that portion of the judgment and remand with instructions to clarify that the bankruptcy court's judgment is not independent, but merely determines that the debt established by the state court judgment is excepted from discharge.

## V. CONCLUSION

We have reviewed the record, and conclude that Gertsch has raised no material issue of fact respecting any element of nondischargeability predicated on his written misrepresentation of his projected income, and that summary judgment was proper.

While we AFFIRM, we agree there is no warrant for a redundant money judgment, which we VACATE, and REMAND for entry of judgment clarifying that it is the state court's money judgment which is nondischargeable.